Thank you, Your Honor. Armin Solis on behalf of the appellant Chavez. May it please the Court. My client, Mr. and Mrs. Chavez, operated a shuttle from Sassabee, Arizona to Tucson, Arizona in a 1995 Dodge van. And on a daily basis, almost, they were stopped by the Border Patrol. They claimed they were stopped by the Border Patrol on each of those stops because they are of Hispanic appearance and descent and because the majority of the passengers in their van were also Hispanic. They filed under the Federal Tort Claims Act three claims that spanned a period of roughly eight months. And they filed, as the Court knows, a complaint alleging constitutional violations. And the only constitutional Bivens claim that's presently before the Court is the Fourth Amendment claims. Now, counsel, on that complaint, where in the complaint do you allege facts sufficient to show that a specific defendant's actions caused a constitutional violation? You have general allegations, but you have, as far as I read the complaint, and please correct me if I'm wrong, I don't see where you allege facts sufficient to show a specific defendant's actions caused a constitutional violation. Well, Your Honor, if you look first at paragraph 148 in the complaint. Individual defendants' thoughts, intentions, and intrusive searches of plaintiffs' shuttles lack consent, probable cause, and reasonable suspicion, and warrants, thereby violating plaintiffs' rights under the laws and Constitution of the United States, in particular the Fourteenth Amendment thereof. Wouldn't it have been more appropriate if you named who stopped, the date they stopped, and your allegations of the unconstitutional stop? We do, Your Honor, in the complaint. We don't name them all because we couldn't. I mean, you can't, for a period that spanned seven years on almost daily stops, we could not say which days the van was stopped by which officer. But for each appellant, appellee, that we named that was a Border Patrol officer, we allege that that Border Patrol agent stopped this van without reasonable suspicion, without probable cause, without a warrant, on the basis of race. If you were the recipient of a motion for a more specific and definite statement under the Federal rules, you would have to name, since the defendants would have to know if they wanted to plead a qualified immunity, the dates and the individuals when the alleged unconstitutional stops occurred. Don't you have an obligation, especially under FIVIS, to state what officer on what date violated the constitutional rights? Your Honor, with some of the appellees, we are able to do that, and we did that. Where did you do that? Well, the one thing you actually alleged didn't seem to have much to do with the Fourth Amendment issues. We didn't say anything such as there was no reasonable suspicion. Yes, we do. On the individuals? Where is that? Well, if you read, that's why. You have to read paragraph 148. We say the defendants. The next question is, did you allege any particular people? I don't know that you needed to, but if you did, where did you? We did, Your Honor. If you look at the principal allegations of the plaintiffs, which begin at paragraph 29 of page 5 of the complaint, which is the excerpt of record number 1, when you go through there, we have periods of time, 2000-2001, you see, in the winter of 2000-2001, Agent Hunt stopped the plaintiff's van and told him that he was under arrest. After checking his license, he demanded that he return the fare to the passengers. But it doesn't say he stopped the van without reasonable cause. But paragraph 148 is the general allegation that all these stops are without probable cause or reasonable suspicion. These are the factual allegations. Let me ask you something. Did you offer to amend your complaint? We didn't get an offer. You did amend it once, did you not? We did amend it once, Your Honor. Was there a motion for a more definite statement? No. No. All right. There was a motion to dismiss or in the alternative, a motion for summary judgment. We asked to be permitted to do discovery because the Border Patrol has the information that we needed to be more specific. In other words, every time they make a stop of a vehicle, there's a record of that stop in the dispatch data that indicates the vehicle stopped and whether or not the stop was fruitful, meaning whether they make an arrest or a seizure or whether they let the vehicle go. We were never permitted to do that. Yes, but to answer, if I could just latch on to Judge Berzon's question to you. You didn't request at the trial level that you be given an opportunity to file a second amending complaint. No, we asked for an opportunity to do discovery so that we could get that information. But to answer her question, and you didn't ask, I went through the briefs, you didn't ask on appeal here that you be given an opportunity to, that if things don't go well for you, that it be remanded to the district court for an opportunity to plead over. In other words, you stood on your complaint. Right. I believe that our complaint is sufficiently specific and definite under Rule 8. Well, if, for example, we were to think otherwise, could you allege in compliance with Rule 11 that Agent Hunt stopped plaintiff's van without reasonable suspicion until, because it doesn't say this, and I'm not sure you can read the other paragraph into it. What? Would that, and similarly with regard to Paragraph 36 and similarly with regard to Paragraph 37, I mean, there's a we have a specific date of a stop, we have an appellee stopped, and we have Paragraph 148, which says that this stop and all the stops are without reasonable suspicion. I don't, I don't, I know we're piercing words, but I don't understand that you've said that. Well, let me read it. You said individual defends and stops, and you think that means all of them. Well, that's, yeah. What else would it mean, Your Honor? Maybe. I mean, that's how you plead. Maybe. Maybe my plea is not, and it should be more specific. But I have a lot of people, I have a lot of stops, I have some specific information, but not all that I need to be able to delineate the precise facts that I need. I need. You would ask to be, if we were meant to allow you to amend one more time, is it your claim you'd need discovery first before you could do that, to be more specific? Yes. Yeah, but you didn't plead honor about such that the defendant, the particular defendant's name being unknown, John Doe, the usual way that you plead when you have a group of people. That's not the way you set up this complaint. Well, we did. If you review the complaint, Your Honor, we say that Border Patrol agents, including the defendants here, on a routine basis stop Hispanic individuals solely on the basis of their race without probable cause, without warrant, and without reasonable suspicion on a routine basis, period. We then identify these individuals and incidents in which they stopped the vehicle of the appellants here. Now, we don't have the exact dates of each stop. We have some of those dates, but we don't have all of the dates. But we know that the named appellants that are Border Patrol agents, not supervisory personnel, stopped this vehicle without, and we allege this, without reasonable suspicion, warrant, or probable cause. All right. Well, let's just moving on from civil practice to the merits of the case. Your client has on numerous occasions, several occasions, transported illegal aliens. That's the record before the Court. That is not the record that the Court ruled on its motion to dismiss on, though. Well, but the facts are from the complaint that on numerous occasions, your client had transported illegal aliens. Yes. On the border account. Yes. Well, that's actually not in the complaint, is it? No. Well, it's on the record. If you can include the record that was essentially not considered by the court below when it ruled on the motion to dismiss, and the court below in its own minute entry and judgment says, I'm not considering any of the facts presented by either side in their pleadings on the motion for summary judgment, because they pled in the alternative. Yes. But it was before the Court that there had been numerous violations or aliens transported by the disease service. Yes, the shuttle service. Now, if you have a situation where on numerous occasions your client is transporting aliens, not on all occasions, but on numerous occasions, why isn't it a responsible way of a border patrol officer saying he has not probable cause, but a reasonable suspicion, sufficient to stop the vehicle and ask the passengers, are you citizens or legally in the United States? If he knows that that vehicle on numerous occasions has transported illegal aliens. It's our contention, Your Honor, one, that that wasn't before the court. Okay. But let's assume for the moment that, and I'll address that question, how did the how did they get the information? They had to stop the vehicle once. At some point in the competing in our case, right, and find illegal aliens on it. Our contention is that every stop they have made has been without reasonable suspicion or probable cause. If the first stop they made was without reasonable suspicion or probable cause or warrant, and they found the illegal aliens, the fruit of the poisonous tree would preclude the use of that information for post-stop stops. What we have here, Your Honor, unfortunately, is a situation in southern Arizona where vehicles are stopped, be they shuttles or vehicles with Hispanics in them, and to see whether or not they're illegal Mexicans. This is a little different, and it is an interesting problem on the merits, although it may not be raised by the complaint. And that is here we have a particular vehicle, a business, which is driving people from a border town to Tucson, and where the government has developed experience that it often has illegal aliens in it. Is that enough for reasonable suspicion? Aside from, let's assume, I know you've alleged it was partly on the basis of their Hispanic background and so on, but washing that out. Suppose they just knew that this particular vehicle, you know, on several different occasions has had illegal aliens in it. But those facts were not before the court. I know that. I know that. I'm just asking you. And I understand, and you may well be right about that. I would suspect you are. But I'm just, since we're talking about it and since we have another set of. . . I think you have to have particularized facts for that trip. Joe Schmo over at Joe's Bar in Sasabe sees these two aliens, these two people, crawl over the fence. So your basic answer is no, it is not sufficient. Or even on 10 occasions. Suppose it was 20 occasions. At some point, does it become enough? Well, here's the problem. They had the ability, the Border Patrol had the ability to investigate this issue and investigate these clients, to call a grand jury to figure out what, as they do sometimes with certain public transportation or private commercial transportation along the border. They develop information that they are routinely soliciting the transportation of aliens. But what you have here is a border town where people, there's a place where they get on this shuttle. The Border Patrol knows that place. If they think that the people that are congregating there are illegal aliens, they can go right up to them, I suspect, and ask them. But they wait until they get on the shuttle. My clients aren't Border Patrol agents. They can't, and the Border Patrol has acknowledged this, are not qualified to inspect the paperwork and find out whether they are or they are not. Do they need reasonable suspicion that your clients are transporting illegal aliens, knowingly or otherwise, or do they just need reasonable suspicion that there are illegal aliens on that bus? I believe they need reasonable suspicion that my clients know these people are illegal aliens. Why? Why can't they just have reasonable suspicion that there are illegal people on the van and they want to get them off? Well, Your Honor, Southern Arizona, you know. I'm not asking you. I just want to know why that's the case. Because there are far too many Mexicans in Southern Arizona to say. But theoretically, legally, why isn't it? What do they have to have reasonable suspicion of in order to stop a car? That the particular vehicle is contained on a particular day. Contained. Illegal aliens. But not that the person driving it is in any way responsible for that. Well, you have to have reasonable suspicion that there's a crime being committed by the vehicle. Being a legal person in the United States is a crime being committed, right? Yeah. But that the person that is transporting that illegal alien knows that. That's what I'm asking you. Do they need to have a legal reasonable suspicion with regard to the person doing the transporting? Or do they – why? Well, because otherwise you don't have a suspicion that that person who's driving the vehicle is committing a crime. But the person driving the vehicle is not being – they're just trying to find out if the people in the vehicle are illegal. So they're not arresting the – I understand that. But, unfortunately, we have the Fourth Amendment, and it even applies in southern Arizona. In other words, you can't just stop this vehicle because you've got a bunch of Mexicans near the border in the vehicle. Why can't you stop the vehicle if you know the vehicle has people who are violating the laws of the United States? Not the driver, but people in the vehicle are – They don't know that. Law violators. The problem is, Your Honor, they don't know that. They just – I'm just trying to get specific about the problem, okay? So the problem isn't whether they know anything about the driver. The problem is whether they have an adequate suspicion with regard to the people in the van. True. Okay. All right. So at least you've clarified that. So then how do they – they have to have that information, and it has to be articulable. It can't be just a vague – they may be illegals. Well, why is it vague if they know on numerous occasions in this vehicle there are people being transported who are illegally here? As we point out in the brief, Your Honor, the only way they knew that was because they illegally stopped them. Well, no, they know that because they know this particular vehicle on numerous previous occasions has transported – not on all occasions – has illegal people in it. Right. And they don't know for sure that there are illegal people at this juncture, but they know that it's very – a wild speculation to say on this occasion there are illegals in it. But you have to – they know this van. They know this van travels where it goes to and where it goes from. And they stopped it. Let's assume for the moment, because this is your argument, Your Honor, that the first stop in which they catch illegal aliens is in violation of the Fourth Amendment. How is it in violation if they catch someone with a reasonable suspicion? No. If the van is just driving – in other words, what I'm saying is – So you're basically saying that you're going to be able to prove that the first time they stopped them, they didn't have reasonable suspicion. You're going to be able to identify the first time. You're going to be able to prove they didn't have reasonable suspicion then. Yes. And then that, therefore, they can't build anything on that is what you're saying. Right. That's what the Fourth Amendment says. That's what the fruit of the poisonous tree says. The problem in southern Arizona is that the roving patrols, if you think about it, and it makes sense, is that they really can't see anything in a vehicle driving down the road other than Mexicans that would suggest that there's any illegal activity. Think about it. I mean, really, and that's what happens, because they sit along the side of the road and they see a vehicle speed past 50, 60, 75, whatever the speed limit is, and they start following it. And they see some Mexicans and they pull it over. What you're really saying is they can take any public bus or anything in that area of Arizona and the likelihood of finding illegal aliens is about the same. Very great. Now, in southern Arizona, in certain parts, they have permanent checkpoints along I-19 from Nogales to Tucson and some other places, and the court has approved that. The Supreme Court has approved that. But these are roving patrols. They don't stop the individuals as they're approaching the shuttle and ask them, do you have papers, et cetera. They wait until they get on, they drive them down the road, and then they stop them. Okay. If you want to reserve any time, you better do that. Thank you very much. Could you clear up for me? I'm a little in the dark as to exactly what was before the court legitimately on a 12b-6 motion here. Certainly, Your Honor. May it please the Court. Teal Lucy Miller from the Department of Justice on behalf of the United States and the 17 individual defendants. The question about what was properly before the court, I think there are sort of two subsets of that question. The first is what did the complaint say about how regularly the shuttle was transporting illegal aliens? There are two instances. There are maybe four or five stops to describe, but in two of those instances the complaint explicitly acknowledges there were illegal aliens aboard the shuttle. There is also an allegation, paragraph 39 of the complaint, which says that the border patrol had an expectation that there were illegal aliens on this shuttle because they got angry whenever there weren't. There's also, in addition, this concession that plaintiffs made in their response to our motion to dismiss that 20 percent of the time they had illegal aliens on board. But that's not in the complaint. It is not in the complaint. That's correct, Your Honor. And it wasn't therefore before the court in the motion to dismiss. Well, Your Honor, a couple of responses to that. First, the district court on page 2 of its opinion explicitly considered that and it said, when it was stating out the facts on which it decided the case, it said, from these stops, plaintiffs were repeatedly found to be transporting illegal aliens. So the district court did believe that the undisputed facts were. If they were deciding a 12b-6, which he said he was, then he should have done that. Well, I'm not sure that's right, Your Honor, for a couple of reasons. I think I'm not aware of any case which says that a trial court is required to ignore a concession by a party, even on a 12b-6 motion. And I'm aware of one unpublished decision from this Court, Flores v. Coley, which says that a plaintiff who concedes in response to a motion to dismiss that he's not suing someone in their official capacity can't argue on appeal that he is suing someone in their official capacity. Well, that's different because that's really an amendment to the complaint, but this is not. Assuming that we go along with your position that even on a 12b-6, if a party acknowledges facts which the Court could take into consideration, i.e., 20 percent of the times that they stopped, they had illegals, and your position is that's legitimately before the Court on this 12b-6 motion. It's an acknowledged, judicially acknowledged fact. Yes, Your Honor. It's mentioned in the court's in the footnote on page 2 of the district court's decision. Yes. Plaintiffs didn't suggest in their opening brief that there was anything improper in the district court's statement of the undisputed facts of this case. Besides that acknowledgment or concession, whatever you want to call it, by the appellant, what else is before the court besides what's in the complaint? Nothing. Well, with respect to the FTCA claims, there's the Form 95, which the district court considered, and he can properly do so because it's a jurisdictional question. But with respect to the Biddens claim, nothing else is before the court. You had a summary judgment motion, right? Excuse me? Didn't you make a summary judgment motion? It was a motion for dismissal or an alternative for summary judgment. And you didn't submit anything with your summary judgment motion? We did submit a number of affidavits by these Border Patrol agents, but the Court did not consider them. Okay. So the only thing we have before us at the appellate level here is, if we accept your argument, the concession or acknowledgment by the appellant concerning the 20 percent people that were illegally in the country plus the complaint, and that's it, correct? Correct. Okay. So passing for one moment the civil procedure question, which we'll get into perhaps later on. On the merits, is there a reasonable suspicion for a Border Patrol officer to stop a van which he knows on prior occasions, perhaps 20 percent of the time, have transported illegal aliens? Just for that reason. I'm sorry? Just on that basis. Right. Yes, Your Honor, with one proviso. And it went not wherever you find the van, not when the van doesn't have people on it, but when it's on the route on which you have an established practice of transporting illegal aliens, when it's clearly marked as this van and clearly identifiable as this van, then, yes, you do have reasonable suspicion. I want to make clear that. Doesn't that amount to the fact that nobody can run a van service in Southern Arizona? I don't think so, Your Honor, because I think that it is the case you can run a van service. It might be subject to being stopped regularly. I will acknowledge that. But it is the case, as Brignone-Ponce recognizes, as Arvizu recognizes, and as this Court has recognized repeatedly, that the United States has an interest in stopping illegal aliens from being within the country, and that the intrusiveness of the stop is, based on reasonable suspicion, is low enough that we will allow under the Fourth Amendment. It is reasonable to make a brief stop. But the point in there, I mean, Arvizu and so on, does depend on what the people in the van are doing at any particular time, not simply the identity of the van or the car. Well, Your Honor, there's a case from the circuit which says that contributed to a reasonable suspicion the fact that the aliens were in a rental car. And the Border Patrol agent said that it was known that rental cars were being used. How would that contribute to it? But your argument is that it's all of it. It's all of it. And that's really the issue. My argument is that any service, any particular vehicle that is known to regularly transport illegal aliens, if it's on that same route and it has people in it. It's regularly driving people from A place to B place in Arizona, and a lot of them are illegal aliens, so they're going to be illegal aliens. I mean, they're not – you have no evidence at all that they're trying to transport illegal aliens, that they're marketing the transport of illegal aliens or anything like that. As your question suggested, it doesn't actually matter whether the driver is violating 1324 if you have reasonable suspicion that the passengers are violating 1324. I understand that, but if you had something additional, such as this van is, you know, the – or is known to be the van that people take if they're illegal aliens, that would be different. But you're not saying that either. You're just saying this van has been known to have illegal aliens, period. Regularly, yes. Right. I mean, if they did it once seven years ago, then no. But regularly, yes. If you are a service which is regularly transporting illegal aliens, there is – and you're on the same route, you're clearly marked, there is reasonable suspicion that you're doing so this time. Does it make any difference – again, this is – I want to know this, too, and maybe this is all arguing that this really does have to get to at least summary judgment, but does it make any difference whether there's any selectivity in which of the services that are doing this are being stopped or whether the Border Patrol has any – I mean, my guess would be that if you stopped any public bus in southern Arizona, you'd probably come to the same conclusion. Your Honor, I don't know if that's true. If you're – if there were a Greyhound route between this town and Tucson that went twice a day and we had 20 percent of the time there were illegals on that Greyhound, I think we could stop that Greyhound. But does it make any difference whether you are? Does it make any difference whether the record turns out that you're stopping this van and you're not stopping other vans? No, but this is the Fourth Amendment. It doesn't. And they do not have any other constitutional claim. Well, it might, because it might suggest that their allegation that you're – you've separated them out because they're Hispanic is really the reason. Well, that might state a violation of the Equal Protection Clause, as Wren makes clear, but it does not state – if they have reasonable suspicion, the fact that they have an ulterior motive is irrelevant under Wren. Well, take it out of this context. Suppose I had been regularly apprehended with drugs on me. I was a drug courier or salesperson. I was selling illegal drugs. And you had arrested me and found out on a number of occasions I was in possession of illegal drugs. Could you at any time at all then stop me and – and Terry – Terry stop, I guess would be – and give me a Terry stop search? No, Your Honor. But I could if you were doing – if you were following the same practice. So if I had in the past regularly seen you visit a particular address and come away with drugs, and you visited that address again, then there might be reasonable suspicion. And I think, again, the standard under Terry is – is – is not that onerous. I mean, the defendant in that case was pacing back and forth in front of a place glass window. But it's not just – But it's fairly onerous in this circumstance because you have somebody who's running a business trying to get people from A to B, and you are essentially stopping them from doing that in a timely manner. They allege on a timely basis. They allege without any reasonable suspicion other than this suspicion. And I don't know if they – they allege this, but one can imagine that it's going to greatly interfere with their business. I mean, why some – by perfect legitimate people who don't want to be on a – on a van that's – where it's going to – every time – it's going to take 30 minutes out of their day while they look for other people's illegal aliens. Well, Your Honor, they – there is – it is illegal under 1324 to knowingly transport illegal aliens. Right. So if a significant percentage of your business is illegal aliens – Well, he proves that you can prosecute them. Excuse me? He proves that you prosecute them. You have to drive out of business that way. But what about this? Well, Your Honor, the standard is reasonable suspicion. I don't think the fact that you've regularly broken the law – That's what I'm trying to say is you can't prove it, because if you could have proved it, you would have proved it. And you can still try. So if their problem is you think they're knowingly doing this, as I was saying before, they're marketing, there's some sub rosa communication going on, and people know to take this van, that's – you know, then you have a criminal case against them. Can I answer the question? But that has an effect in the summary judgment, but you can't consider those now. I think that's right. If I could, I would like to point out there are 16 Bivens defendants who remain in this case. There is only an allegation of a stop involving four of them. So there are – And there are allegations that several others of them are supervisors and knew what was happening. Well, that's right. But if you take the six simplest defendants, there are six defendants who are not alleged to have been supervisors and who are not alleged to have ever stopped the van. All right. So let's hypothetically watch the mat. Let's deal with the rest. Then, in addition, there are four defendants who have alleged to have stopped the van. Of those four defendants, one of them, Agent Schwernweber, is not mentioned in the argument of Plaintiff's opening brief. There is one reference to him in the brief at all. It's on page 8 of the Statement of the Facts. It does not say he stopped the van. They waived an argument that the Bivens claim against him was improperly dismissed. As to the other three, none of the allegations specifically says he stopped my van without cause. As he – No, they claim they need discovery in order to flesh out who are the actual persons that stopped it. That could be – Your Honor, as you pointed out, they did not sue unknown board employees. They sued 17 individuals. Incidentally, how long does a stop take to stop the van and ask the passengers to identify themselves? Maybe I should ask the appellant more appropriately that. But from your point of view, how long does a stop take? I don't think we know on the basis of this record at this point. But I think at least one Supreme Court case, it says 5 to 30 minutes for a reasonable suspicion stop. I think that one of the complaints, one of the stops that's described here, which, again, there's no specific allegation that it wasn't founded on any – that it was without foundation, is described to have lasted about an hour. Was there any information as to what the bus drivers were charging, quote, illegal aliens as opposed to regular customers? Was that before the court on the 12B6 motion? I believe what the complaint says is they charged $10, but it makes no suggestion that the price differed. I believe that one group, 120, whereas the others were charged 10 and 5, if I read the record correctly. There – I believe the complaint says that on – when the shuttle service picks someone up not on the regularly scheduled route, they charge $120. All right. Thank you. That's all I wanted to know. What about the – your – Mr. Chavez's attorney tries to fill in the reasonable suspicion gap by pointing to paragraph 148 as being a generic allegation of lack of reasonable suspicion. And what's wrong with that? He says individual defendants stop – I mean, there's a grammar problem here, but stops, detentions and intrusive searchers of plaintiff's shuttle. There's a missing apostrophe is the problem. Lacks consent, probable cause for reasonable suspicion. Lacks – and that seems to be a statement about all of them. It just says all of their stops. Well, but there are only four stops that have been identified. So even if you're right that it's a statement that every stop we've described so far is illegal, it's only as to four of them. All right. But you said you were – you began by – you're now switching, turning around your earlier argument. Your earlier argument was that the four that were alleged didn't allege reasonable suspicion. And I'm saying why isn't this allegation sufficient to fill that in? Well, I'll tell you – I want – I'm sorry if I've been unclear. What I want to say is –  This is a complaint we're reading. We are – in Conley v. Gibson and 75 other cases where – Conley says you have to give fair notice of what the claim is and, critically, the grounds on which it rests. Okay. And you don't think by reading this complaint you can know that they were saying that those four stops and every other one that these defendants did lacked consent, probable cause for reasonable suspicion. That may be wrong, but that's what they're saying. I don't think you can read it that way for a couple of reasons. One, again, I do think you have to separate out the four and then the other defendants. For the four people who are alleged to have committed a stop, why isn't this good enough? It's not good enough. This Court's decision in Wong involves a situation where there's an allegation that three INS officials violated plaintiffs' First and 14th Amendment rights when that defendant – when that INS defendant detainee was put in the Multnomah County Jail. And we knew from the other allegations in that complaint that some of those people had nothing to do with the – that each of them had defined positions and that they didn't have anything to do with that particular allegation. Well, what this Court said is just because you have a general legal conclusion this violated X Amendment of the Constitution and you name a particular defendant isn't good enough. You have to say how each defendant violated the law. And I think – I think it is the case that to satisfy Conley, you can't just say you stopped me and then 13 pages later in the complaint say every stop is illegal. Paragraph 91 of the complaint, by the way, acknowledges that some of the stops are with suspicion. It doesn't acknowledge that some of the stops are to these defendants are, but it says, if you read it, it says, Well, that means that in some cases they do. And – and so the complaint makes massive allegations of systemic stopping as to unidentified Border Patrol agents. As to the four Border Patrol agents who were actually identified, there is no specific allegation of illegality. And Conley requires at least that. It requires at least that you say, as to each defendant, you did this and you sent this complaint back and asked them to amend the complaint to say that, they'd say it because they are saying it. Well, Your Honor, I'm not sure you can assume that for the following reason. They are happy to allege illegality when they're doing it generally against the Border Patrol. When they're being specific, they don't. And this morning, opposing counsel said he didn't think he needed to amend his complaint. He hasn't asked the Court to do so. He made a representation to us that he understood that – that section to read back into the others. So if he didn't – wasn't willing to add that allegation specific, he would be saying something inconsistent with what he told us. Well, all right, Your Honor. But I still think that – that the allegation is just an allegation of a legal conclusion. It doesn't give us any facts which would suggest a violation of the Fourth Amendment as to the four stops that are described. Well, that's a different issue. So then we're into, you know, the whole sort of specific pleading problem. That's right. Which the district court relied on, but which has now been overturned. I think that even under Swerkiewicz, this – this complaint fails to satisfy the basic requirements of Rule 8. I think that if you look at what Swerkiewicz said, it said there's no heightened pleading requirement, but this complaint gets by because that was a case which alleged a violation of national origin discrimination and age discrimination, and it said his pledges – It said, I assume it said, he did this because of my age and my race. And he – it gave – it says specifically, it gave the – well, let me – what the court said was the complaint detailed the events leading to a plaintiff's termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination. Here, they haven't done that. They've – in a couple cases, they've identified stops with a date, but in a couple cases, they haven't. And they haven't said what it was about the stop that was illegal. They just said it was illegal. Kagan. Okay. Just a minute. Yes. I'm sorry. Your time is running out. You said in some of the cases they did. If you take paragraph 37, which gives a specific date, and combine that with paragraph 148, why isn't that sufficient? Because paragraph 148, as to this defendant who is alleged to have done a stop, is just a legal conclusion. They tell us nothing about the circumstances of the stop. There's no allegation that the stop was without foundation. There is. Without reasonable cause. That's what it says. In paragraph 148. But as to this defendant, there's no specific allegation that it was without foundation. My understanding of Smierkiewicz or whoever one says it, and our elucidation since then, is that in a Title VII case, if you file a complaint that says I was an immigrant, I was fired because I was black, I'm an African American, you have stated a complaint. Do you disagree with that? Yes, I do, Your Honor. I think that you have to say a little bit more than that. I think you have to say – maybe I misheard you, but I think you have to say something about the circumstances of your dismissal. If you look at – My understanding, and we have reversed cases on that ground. Well, if you look at Rule – Form 9 of the Federal Rules of Civil Procedure, which is a form pleading about a car accident. It doesn't say much, but it says on or about this date, at this intersection, defendant drove negligently and ran over me. And what? And ran over me. Okay. And here, what's missing is, in some cases, the date. In some cases, there's no – there's no explanation of where the stop happened. The date is always. That's the date. Well, Bivens liability is individual to the defendant. You can't – you can't sue an individual defendant and say, you stopped me without saying when. And if you think you stopped me ten times, and if you want damages for each of those ten times, you have to identify them. Well, can you read the complaint broadly and say that on every occasion, I think Pellin was saying that we were stopped, the stop was without reasonable suspicion on every occasion. That's – that's what he's asking us to do. Your Honor, for the reasons I've suggested, I don't think you can read the complaint that way. If you can, that still only keeps this case alive as to three defendants. Defendants Rios, Hunt, and Demick. And as to those defendants – And what about the supervisors? Well, Your Honor, the allegation of supervisory liability, if you look at it, paragraph 26, doesn't actually say anything about unreasonable suspicion. It says, And therefore, all they're saying is these supervisors knew that there were roving patrols. There's nothing inherently wrong with stopping a vehicle from a moving vehicle as opposed to a stationary one. Roving patrols – invoking roving patrols isn't enough to state a violation of the Constitution. Thank you very much. Your argument is helpful. We have a little extra time. I'll give you about a minute. I would just say, Your Honors, that if you read the complaint, we put in as much specific information as we had available. There is a lot more information we could have put in had we been given the opportunity to do discovery. I was counsel in Hodger's Durgeon, which was a class action against the Border Patrol. And I know what is available. I know that the radio logs would provide the dates, the times, and the names of the officers. We didn't have access to that. The complaint clearly states in plain language that these stops, all of them, were without reasonable suspicion, probably. Am I correct in believing that if anything turned on whether you could allege a lack of reasonable suspicion with regard to the four or five specific stops that are discussed, that you would amend the complaint to put that in? Yes. Okay. I didn't have it. But if I might state, there are a couple of other issues before the Court. One, the Federal Tort Claims Act claims were thrown out essentially because the claimant when they filed them were not real specific on the nature of the claim. Okay. Yes, we know that. All right. And the other was the declaratory and injunctive relief that we requested the Court do that on the qualified immunity. Thank you very much. Thank you. Thank you, counsel. The case of Chavez v. United States is submitted.
judges: D.W. Nelson, Cowen Berzon